**BOWLES v. MASON.**

**Civ. A. No. 105–E.**

District Court, N. D. West Virginia.

Jan. 4, 1946.

David L. Kabaker, Enforcement Atty., Regional Office, Office of Price Administration, of Cleveland, Ohio, Walter M. Elswick, District Enforcement Atty., of Hinton, W. Va., and Harold D. Slaven, Enforcement Atty., Office of Price Administration, of Morgantown, W. Va., for plaintiff.

E. L. Maxwell, D. H. Hill Arnold, and Arnold & Crawford, all of Elkins, W. Va., and Daniel R. Forbes, of Washington, D. C., for defendant.

BAKER, District Judge.

This case involves the proper interpretation of and application of the facts of the case to certain provisions of Maximum Price Regulation No. 146, issued by the Administrator of the Office of Price Administration under Section 2(a) of the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 902(a).

Defendant, W. H. Mason, in 1933, leased a lumber yard and a plant equipped to make small dimension stock at Elkins, West Virginia, and established a wholesale lumber yard, known, as he claims, in the lumber industry as a distribution yard, and also operated the small dimension plant as a separate unit making shoe heel stock and other small dimension stock for furniture, etc. In 1940 he bought the lumber yard and plant and continued the same kinds of business until the present time.

On April 28, 1942, General Maximum Price Regulation was issued by the Administrator. The defendant paid for the lumber that went into his lumber yard the maximum prices fixed by said General Maximum Price Regulation. Thereafter Maximum Price Regulation No. 146 was issued by the Administrator that became effective June 1, 1942, and which fixed maximum prices for Appalachian hardwood lumber for direct mill shipment. The defendant, not owning or having an interest in a sawmill, purchased all of the lumber for his wholesale lumber yard from mills and other distribution yards, and paid maximum ceiling prices therefor as fixed in Maximum Price Regulation No. 146.

Subsequently, and after the effective date of Maximum Price Regulation No. 146, defendant sold Appalachian hardwood lumber for prices above the ceiling prices fixed in said MPR 146, claiming that his wholesale lumber yard more nearly resembled that of a distribution yard and was not a mill under the definitions contained in MPR 146, and therefore the mill ceiling prices fixed in MPR 146 did not apply to his distribution yard sales. Alleging that the highest prices at which defendant could sell lumber from his wholesale lumber yard were the prices fixed in MPR 146, the Administrator of the Office of Price Administration brought this action to recover treble damages against the defendant for sales of 5,000,000 feet of lumber alleged to be covered by MPR 146, and sold by him at prices in the aggregate of $72,817.20 in excess of the prices fixed in MPR 146.

The problem in this case is to determine whether defendant's business more nearly resembles a distribution yard, as defined under Section 1382.8(a)(5)(i) and (ii), or more nearly resembles a mill, as defined under Section 1382.8(a)(4)(i) and (ii). This involves an interpretation of an administrative regulation and the Court will look to the administrative construction of the regulation where there is doubt, and follow the administrative interpretation unless it is plainly erroneous or inconsistent with the regulation. Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. ——. There has not been an administrative interpretation of the Sections of MPR 146 involved in this case so the Court has before it the definitions for interpretation and application to the facts.

The definitions of a mill and a distribution yard as given by MPR 146, involved in this case, when applied to the evidence as applicable to each element or clause of each definition, shows the following status of defendant's establishment:

## MILL—MPR 146 AS DEFINED UNDER SECTION 1382.8(a)(4)(i)

Which processes into the items of lumber covered by this Maximum Price Regulation No. 146, by sawing or planing, or ships to milling-in-transit operations for such processing by sawing, planing, or kiln drying, at least 25 per cent of the volume of Appalachian hardwood lumber or logs purchased or received by it.

(Note: The plaintiff does not plead that defendant's business or establishment comes under this definition of a mill, and offered no evidence that defendant processed into items of lumber covered by MPR 146, by sawing or planing, at least twenty-five (25) per cent of the volume of Appalachian hardwood lumber or logs purchased or received by him.)

### STIPULATION

"It is stipulated and agreed to be a fact that between June 15, 1943, and December 15, 1943, the defendant received at his establishment by truck and rail 3,782,898 board feet of lumber and that of said total receipts 2,382,033 board feet were received by rail shipment and that 1,400,865 board feet were received by truck shipments; that during said period the defendant shipped by rail 1,718,069 board feet, and that he shipped by truck 270,302 feet, and that of the total receipts he processed into items of lumber by planing and sawing 682,249 board feet; Record Pages 179–180.

(Note: All of the 3,782,898 board feet were received in the unit of the defendant's establishment claimed by him to be a distribution yard. He only processed, by planing and sawing, into items of lumber covered by MPR 146, less than 18% thereof, or 682,240 board feet. It is therefore obvious that defendant's establishment is not a mill within the above definition because he processed less than 25% of the lumber purchased and received by him into items of lumber covered by MPR 146.

## DISTRIBUTION YARD—MPR 146 AS DEFINED UNDER SECTION 1382.8(a)(5)(i)

Which processes into the items of lumber covered by this Maximum Price Regulation No. 146, by sawing or planing, or ships to milling-in-transit operations for such processing by sawing, planing, or kiln drying, less than 25 per cent of the volume of Appalachian hardwood purchased or received by it, and

### STIPULATION

"It is stipulated and agreed to be a fact that between June 15, 1943, and December 15, 1943, the defendant received at his establishment by truck and rail 3,782,898 board feet of lumber and that of said total receipts 2,382,033 board feet were received by rail shipment and that 1,400,865 board feet were received by truck shipments; that during said period the defendant shipped by rail 1,718,069 board feet, and that he shipped by truck 270,302 feet, and that of the total receipts he processed into items of lumber by planing and sawing 682,249 board feet; and that of the truck receipts 157,993 board feet were received from J. Natwick and Company of Alexander, West Virginia." Signed by all counsel. Record Pages 179–180.

(Note: Under this agreed statement of fact it appears that defendant, during the period that governs a decision of this case, received 3,782,898 board feet of lumber at his yard and processed into items of lumber covered by MPR 146, by sawing or planing, only 682,249 board feet thereof, or about eighteen per cent (18%). If it was not for the word "and" appearing at the end of this definition, defendant's establishment would be a Distribution yard for he processed into items of lumber covered by MPR 146, by sawing and planing, less than 25 per cent of the volume of Appalachian hardwood purchased and received by him.)

Section 1382.8(a)(4)(ii) defines a Mill as follows: "Which resembles the following described establishment more nearly than that described under the definition of a "distribution yard" in subparagraph (5)(ii) of this paragraph: "An establishment which concentrates and prepares lumber for commercial shipment, which keeps in stock primarily Appalachian hardwood lumber, which has its lumber brought in chiefly in rough green form by truck from small local sawmills and sells chiefly for rail shipment, and which has been located at its particular site in order to be near the lumber producing area."

This is the definition that plaintiff charges is paragraph four (4) of the complaint that controls this case and governs defendant's establishment. The complaint however does not charge that defendant sells his lumber chiefly for rail shipment thereby admitting that his establishment does not resemble a mill in this particular.

Section 1382.8(a)(5)(ii) defines a Distribution Yard as follows:

"Which resembles the following described establishment more nearly than that described under the definition of "mill" in subparagraph (4)(ii) of this paragraph:

"A wholesale or retail lumber yard which purchases or receives lumber from a mill or another distribution yard for purposes of unloading, sorting, and resale or redistribution, which regularly maintains a miscellaneous stock of lumber from different regions, which obtains its lumber primarily by rail shipment and sells primarily for truck shipment, which is equipped to make quick deliveries of many different items of lumber, and which has been located at its particular site primarily in order to be near a lumber consuming area."

Defendant in his answer claims that his establishment comes under the definitions of a distribution yard and therefore he is a distributor, or is operating a distribution yard and not a mill.

A study of the definition of a Mill under Section 1382.8(a)(4)(ii) shows it is divided into four elements or clauses. The definition of a Distribution Yard under Section 1382.8(a)(5)(ii) is divided into five (5) elements or clauses.

| MILL—MPR 146 AS DEFINED UNDER SECTION 1382.8(a)(4)(ii) | DISTRIBUTION YARD—MPR 146 AS DEFINED UNDER SECTION 1382.8(a)(5)(ii) |
|---|---|
| 1. An establishment which concentrates and prepares lumber for commercial shipment.<br><br>(Note: There is no evidence that defendant concentrates and prepares lumber for commercial shipment within the explanation of such a business as given by plaintiff's witness Krausz. Record Pages 55–56.) | 1. A wholesale or retail lumber yard which purchases or receives lumber from a mill or another distribution yard for purposes of unloading, sorting, and resale or redistribution.<br><br>Q. When that lumber comes into your yard what is done with it? A. It is unloaded and sorted and graded, and it is placed on different piles according to grade, and some of it is taken to the plant to be fabricated and some of it is shipped out as is except for special width and length and grade. Record Page 69.<br><br>Q. You have been inquired about with respect to purchases. You may tell the Court whether or not you purchase lumber from mills and other distribution yards. A. I do. Record Page 85.<br><br>Q. You may tell the Court whether or not when you received this lumber if you unloaded, sorted and resold and redistributed the same. A. Yes. Record Page 86. |

Q. At that time did you have an established yard? A. I did. Record Page 184.

Q. You have in detail described your establishment, explaining how it was established, and so forth. Was that a wholesale or a retail yard? A. Wholesale. Record Page 191.

(Note: Clearly defendant's establishment comes within clause or element one (1) of the definition of a distribution yard.)

2. Which regularly maintains a miscellaneous stock of lumber from different regions.

Q. What I meant, Mr. Mason, by the type of your operation—let's start out in this manner. Where is your lumber purchased that is received by you in your operation here? A. That's purchased over a wide territory—West Virginia and Virginia, Kentucky, and a number of States. Record Page 68.

Q. You have been asked on direct examination whether or not you kept in stock primarily Appalachian hardwood lumber, and you answered "Yes." You may tell the Court whether or not you regularly maintain a miscellaneous stock of lumber from different regions. A. I do.

Q. What regions do you regularly maintain just miscellaneous stock? A. We bring it from the South as far as the Mississippi Valley, and we bring it from the North as far as Canada. Record Page 85.

Q. A million feet, and of that million feet how much of it constituted lumber that was received from these other regions? A. I would say twenty-five per cent. Record Page 91.

(Note: The above evidence when applied to the clause or element above captioned shows defendant's establishment clearly comes within said clause or element of the definition of a distribution yard. And with equal certainty the evidence shows that he keeps in stock primarily Appalachian hardwood lumber which brings his establishment within clause two (2) of the definition of a mill.

Therefore defendant's establishment resembles both a mill and a dis-

2. Which keeps in stock primarily Appalachian hardwood lumber.

Q. Where is the most of your lumber purchased? A. I would say the most of it is purchased in West Virginia. Record Page 68.

Q. From the West Virginia sawmills? A. Right. Record Page 69.

(Note: From the above and the evidence under element or clause two (2) of the definition of a distribution yard, it is clear that defendant's establishment keeps in stock primarily Appalachian hardwood lumber, but he also regularly maintains a miscellaneous stock of lumber from different regions.

Therefore defendant's establishment resembles both a mill and a distribution yard under the second (2) element or clause of each definition without a preponderance of evidence in favor of either.)

3. Which has its lumber brought in chiefly in rough green form by truck from small local sawmills and sells chiefly for rail shipment.

Q. The lumber so received by you, let us say, if you know, during the year 1941 was in what condition, as to whether or not it was air dried or rough green lumber? A. Dried.

Q. You would say that all of it was air dried? A. Well, at a guess I would say ninety per cent of it was. Record Pages 69–70.

Q. What percentage would you say of the lumber received by you in 1941 was air dried? A. I'd say ninety per cent. Record Page 70.

Q. What percentage of the lumber so received by you during the first six months preceding December 15, 1943, was air dried and what percentage was rough green lumber? A. Well, I can't give you the figures, exact figures, offhand, because I didn't make them up myself, but I can give you the approximate figures, because we would have to go into the books and figure that on out. Record Page 72.

Q. In other words, ninety per cent—A. I would say.

Q. (Continuing)—of it was air dried and the other ten per cent would be green? A. Yes. Record Page 72.

Q. With that knowledge, would you say that the greater percentage was brought in to your yard by truck or by rail? A. By rail.

Q. What percentage of the 3,782,-898 board feet purchased by you over the period in suit came from these small local sawmills? A. I do not have the figures before me, I can give you an estimate of it.

Q. All right. A. About 100,000 feet. Record Page 220.

(Note: Defendant's establishment does not resemble this element or clause of a mill at all. He buys only about 1/37 or 3% of his lumber from small local mills in rough green form by truck.)

tribution yard under the second (2) element or clause of each definition without a preponderance of evidence in favor of either.

3. Which obtains its lumber primarily by rail shipment and sells primarily for truck shipment.

Q. With that knowledge, would you say that the greater percentage was brought in to your yard by truck or by rail? A. By rail. Record Page 73.

Q. Do you know approximately, then, whether or not the greater percentage was delivered by rail or delivered by truck? A. The greater percentage of them before the O.D.T. regulations, was larger by truck.

Q. And—A. After that it was larger by rail. Record Page 73.

Q. And you may tell the Court whether or not for the six months' period before the institution of this suit you primarily obtained your lumber by rail shipment. A. The largest part of it, yes. Record Page 86.

Q. But before the Government regulations took effect, particularly the O.D.T. and the regulations limiting the use of gas, tires, trucks and tubes, you may tell the Court whether or not you sold your lumber primarily for truck shipment. A. We did. Record Page 86.

STIPULATION

"It is stipulated and agreed to be a fact that between June 15, 1943, and December 15, 1943, the defendant received at his establishment by truck and rail 3,782,898 board feet of lumber and that of said total receipts 2,382,033 board feet were received by rail shipment and that 1,-400,865 board feet were received by truck shipments;" Record Page 179.

(Note: Defendant's establishment resembles this clause or element of the definition of a distribution yard. He processed by sawing or planing less than 25%. He received his lumber primarily by rail shipments and sold primarily for truck shipments until O.D.T. regulations prevented him from doing so.)

4. Which is equipped to make quick deliveries of many different items of lumber.

Q. You may tell the Court, Mr. Mason, if your business was equipped to make quick deliveries of many different items of lumber. A. It was. Record Page 88.

Q. What was the equipment you had? A. Trucks. Record Page 88.

Q. The last question I have asked was if, between June 15, 1943, and December 15, 1943, he was equipped to make quick deliveries of many different items of lumber. A. I was. Record Page 88.

Q. And to what points did you make these quick deliveries? A. Washington and Baltimore and Pennsylvania. Record Page 88.

Q. Now, also during this period, you said you were equipped to make quick deliveries of your lumber to your customers. What do you mean by quick deliveries? A. Overnight delivery. Record Page 91.

Q. By truck? A. Right. Record Page 91.

Q. Isn't it a fact, Mr. Mason, that during this period, however, that most of your lumber was shipped by rail rather than by truck? A. That's right, but we were equipped to do it the other way as far as we could go on account of the regulation. Record Pages 91–92.

(Note: Defendant's establishment resembles a distribution yard under this clause or element of the definition of a distribution yard. He was equipped to make quick deliveries of many different items of lumber.)

4. And which has been located at its particular site in order to be near the lumber producing area.

Q. Mr. Krausz, on your direct examination you defined a lumber producing area and a lumber consuming area. I ask you at this time whether Elkins is located in a lumber producing area or a lumber consuming area. A. I would say it is located in a lumber producing area. Record Pages 98–99.

(Note: It is clear that the defendant did not locate his establishment in Elkins to be near a lumber pro-

5. And which has been located at its particular site primarily in order to be near a lumber consuming area.

Q. Mr. Mason, why did you locate your establishment at Elkins? A. That's for several reasons, the location of the site, the plant with the yard, facilities for handling lumber, and two railroad sidings connected, and a plant already built suitable for this kind of work, and the transit privileges we had in operation here with the different railroads for bringing lumber in from other sections of the country. Record Page 191.

ducing area. Other primary reasons governed his decision. Therefore defendant's establishment more nearly resembles a distribution yard under element or clause five (5) of the definition of a distribution yard than under this fourth element or clause of the definition of a mill.)

Q. You may tell the Court if you located and established your wholesale lumber yard at Elkins primarily to be near a lumber producing area. A. That was not the prime reason. Our reason was, as I stated before, because we had available plant with these favorable rates in effect, which would enable us to bring lumber from all sections of the country, because the lumber supply in this country was pretty well exhausted. This has been a consuming lumber town for a number of years, and plants have moved out because of not getting their lumber supply. Record Pages 192–193.

E. M. Bonner, H. W. Kelly, George H. Dornblazer and C. A. Gross, all outstanding lumbermen of the Elkins area, testified that Elkins is in both a lumber producing and lumber consuming area. They each gave it as their opinion that defendant's establishment more nearly resembles a distribution yard than a mill under the definitions of each as given in MPR 146. The opinions of these outstanding and practical lumbermen are entitled to great weight. Record Pages 234, 239, 245, 246, 252, 253, 257, and 259.

(Note: From the above evidence it is clear that many things, other than whether Elkins is in a lumber producing area, entered into the location of the defendant's establishment in Elkins. He did not locate at Elkins, solely to be near a lumber producing area. Therefore under element or clause five (5) of the definition of a distribution yard defendant's establishment more nearly resembles a distribution yard than a mill under element or clause four (4) of the definition of a mill.)

From the foregoing analysis it appears that defendant's establishment only resembles the definition of a mill as given in Section 1382.8(a)(4)(ii) in one of the four elements or clauses thereof, or a 25% resemblance. While the analysis of the evidence and the definition of a distribution yard shows that defendant's establishment resembles the definition of a distribution yard as given in Section 1382.8 (a)(5)(ii) in each of the five elements or clauses thereof, or a 100% resemblance, and in addition the defendant's establishment falls clearly within the definition of a distribution yard as given in Section 1382.8(a)(5)(i), in that he processes into items of lumber covered by MPR 146, by sawing and planing, less than 25% of the Appalachian hardwood purchased or received by him.

There are other facts in the record that show the defendant's establishment is and was a distribution yard. In the Matter of McClellan Lumber Co., Inc., in an opin-

ion denying a protest, involving Regulation No. 219, covering Northeastern Softwood Lumber, Chester Bowles, Administrator, interpreted the definition of a typical distribution yard contained therein, which definition is as follows (Opinion rendered June 8, 1942, Opinions and Decisions O.P.A. page 119: "A typical distribution yard is a wholesale or retail lumber yard which gets lumber from mills or other yards; unloads, sorts, and resells or redistributes it; which regularly maintains a varied stock of lumber from different regions; which gets its lumber, except for local species, mostly by rail and sells mostly for truck shipment, which is equipped to make quick deliveries of many different items of lumber; and which has been located at its particular site in order to be near a lumber consuming area."

The Administrator in his opinion said: "A typical distribution yard contained in the regulation calls for an established yard having buildings, trucks, machinery, storage sheds, an office and sales force."

The evidence shows the defendant had and has all of the items that the Administrator in his opinion said are necessary to make a typical distribution yard. He has had an established yard since 1932. He has buildings, trucks, machinery, storage sheds, an office and sales force. (Record Pages 183–184–88.)

The War Production Board in transacting government business with the defendant classified his establishment as a distribution yard. It also classified him as a No. 1 Consumer in making small dimension stock such as shoe heel stock, school supplies stock, furniture stock, template, etc. (Record Page 68.)

### Findings of Fact

1. The defendant, W. H. Mason, does not own a sawmill and has no financial interest in any sawmill.

2. That said Mason does not have his lumber brought in chiefly in rough green form by truck from small local sawmills, but upon the contrary, of the stock of 3,-782,898 board feet of lumber so received in said period of six months, only 100,000 feet thereof was received by Mason from small local sawmills and only 10 per cent was received by Mason in rough green form.

3. A stipulation of counsel (Record Page 179) admits as a fact that Mason received at his establishment by truck and rail 3,782,898 board feet of lumber during the period between June 15, 1943, and December 15, 1943, which said amount is the volume of lumber received by the defendant, Mason, within the six months immediately prior to the transaction, subject to the Maximum Price Regulation 146. of counsel (Record Page 179) W. H. MPR 146, 1382.8(6).

Mason received 2,382,033 board feet by rail and 1,400,846 by truck shipments; hence, the Court finds that the lumber received

4. In accordance with the stipulation by W. H. Mason was received primarily by rail shipment.

5. Said stipulation of counsel admits that Mason processed into items of lumber by planing and sawing 682,249 board feet, or approximately 18 per cent of the volume of lumber so received by him.

6. That Mason was equipped to make quick delivery of many different items of lumber and did, prior to ODT regulations, make overnight deliveries of lumber to Washington, D. C.; Baltimore, Maryland; Philadelphia, Pennsylvania; and Pittsburgh, Pennsylvania.

7. That for the six months prior to the institution of suit Mason shipped by rail 1,718,069 board feet and that he shipped by truck 270,302 feet. That prior to the regulations issued by the Office of Defense Transportation Mason shipped chiefly by truck.

8. That W. H. Mason did not locate his business at the particular site in order to be near the lumber producing area, but that the reasons for such location were:

a. Available plant facilities.

b. Rail facilities, including applicable milling-in-transit rates.

c. Nearness to local market and excellent shipping facilities to Washington—200 miles—and other cities.

9. That the area in and around Elkins is both a producing and a consuming area.

### Conclusions of Law

■ From the foregoing findings of fact the Court draws the following conclusions of law.

1. That the establishment of W. H. Mason is not a mill under the provisions of 1382.8(a)(4) because said Mason processes by sawing or planing or ships to milling-in-transit operations for such processing by sawing, planing, or kiln drying, less than 25 per cent of the volume of

Appalachian hardwood lumber purchased or received by him.

2. That the establishment conducted by Mason resembles an establishment more nearly described in 1382.8(a)(5)(ii) than a mill as described in 1382.8(a)(4)(ii), and therefore, the establishment of W. H. Mason more nearly resembles that of a distribution yard than that of a mill.

3. The plaintiff having admitted in his brief that in the event W. H. Mason's business should be classified as a distribution yard, there has been no violation of Maximum Price Regulation 146, the complaint should be dismissed.